IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

    v.                                          22-CR-34

HORMOZ MANSOURI,

                Defendant.

## GOVERNMENT'S RESPONSE TO DEFENDANT'S OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT, RECOMMENDATION AND ORDER

THE UNITED STATES OF AMERICA, by and through its attorney, Trini E. Ross, Attorney for the United States for the Western District of New York, Michael DiGiacomo, Assistant United States Attorney, of counsel, hereby submits its response to the defendant's objections ("Objections") to the Report, Recommendation and Order ("R&R") of Magistrate Judge Michael J. Roemer [*see* Docket No. 58]. Judge Roemer correctly denied the defendant's motions to dismiss the indictment and therefore this Court should adopt/affirm Judge Roemer's Report, Recommendation and Order in its entirety.

## FACTS

The defendant operated the following business in the Western District of New York: HLM Holding LLC, EI Team Inc., NPTS Inc., 2060 Sheridan Drive LLC, 212 Holden Avenue LLC, 350 Old Niagara Falls Boulevard LLC, 47 East Amherst LLC, and 3600 Harlem Road LLC. EI Team, Inc., and NPTS Inc., were the two entities operated by Mansouri that had employees and therefore the only two entities that qualified to apply for PPP and EIDL loans.

      i.      **The Paycheck Protection Program (PPP)**

In or around March 2020, The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was enacted. The CARES Act was designed to provide emergency financial assistance to millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic.

One source of relief provided by the CARES Act was the authorization of billions of dollars in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP").

In order to obtain a PPP loan, a qualifying business had to submit a PPP loan application, signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan application, the small business (through its authorized representative) needed to state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. This information was material as it was used to calculate the amount of money the small business was eligible to receive under the PPP. In addition, businesses applying for a PPP loan were required provide documentation in support of their payroll expenses. The amount of a PPP loan was calculated by taking the average monthly payroll provided by the borrower and multiplying that number by 2.5. The intended purpose behind the formula was to provide the business with approximately 10 weeks of payroll.

PPP loan applications were processed by a participating lender.  If a PPP loan application was approved, the participating lender funded the PPP loan using its own monies, which were 100% guaranteed by the SBA.

A business that obtained a PPP loan was required to use the money on certain permissible expenses, such as payroll costs, interest on mortgages, rent, and utilities.  The loan allowed the interest and principal on the PPP loan to be entirely forgiven if the business used the loan proceeds on authorized expenses.

    ii.    **Economic Injury Disaster Loan (EIDL)**

A second source of relief provided by the CARES Act was funding to the SBA for the Economic Injury Disaster Loan ("EIDL") Program.  The EIDL program was designed to provide economic relief to businesses that were currently experiencing a temporary loss of revenue due to COVID-19.  The program provided low interest loans to pay for expenses that could have been met had the pandemic not occurred, including payroll, paid sick leave for employees, increased production costs due to supply chain disruptions, and business obligations such as debts, rent and mortgage payments. EIDL loans were funded based on revenue minus cost of goods sold. In addition to the EIDL program loans, small businesses could request an EIDL Advance from $1,000 up to $10,000, based on the number of employees indicated on the EIDL application.  The EIDL Advance was a grant and therefore did not have to be repaid.

Like the PPP loan, to obtain an EIDL, a qualifying business had to submit a loan

application signed by an authorized representative of the business. As with the PPP loan, the EIDL application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications to be eligible to obtain these loans. Unlike a PPP loan, EIDL loans were processed and funded directly from the SBA, not through a participating lender.

### iii. The Defendant's Scheme to Defraud

With MANSOURI's knowledge and at his direction Mansouri directed two of his employees work together and submit multiple EIDL and PPP loan applications, that contained materially false, fraudulent pretenses, representations and promises and in support of the applications, create and submit false and fictitious documents which included a fraudulent IRS form.

Only two of Mansouri's entities had employees (EI Team and NPTS) while the remaining entities were holding companies with no employees. Each of the PPP loan applications submitted on behalf of the Mansouri controlled entities and at Mansouri's direction inflated or completely fabricated the average monthly payroll. In fact six of the eight entities that sought and obtained PPP loans did not have actual employees or payroll expenses.

As noted above, EIDL applications were funded based on revenue minus cost of goods sold. At Mansouri's direction each application submitted on behalf of Mansouri's

controlled entities, falsely represented revenues and cost of goods sold. For example, EIDL loan applications were submitted for holding companies that had no cost of goods sold.

The false information submitted in support of both the PPP and EIDL applications was material since the lenders relied on this information when considering whether to fund a loan application. This false information caused multiple federally insured financial institutions and the SBA to send, through interstate wires, funds to bank accounts controlled by MANSOURI in the Western District of New York. MANSOURI would then routinely transfer the funds back and forth through numerous bank accounts, often times in excess of $10,000, in an attempt to conceal or disguise the nature, location, source, ownership, or control of the proceeds.

On or about March 10, 2022, a Grand Jury sitting in the Western District of New York returned a 40 Count Indictment charging Mansouri with violating Title 18, United States Code, Sections 1343 (wire fraud); 1344 (bank fraud); 1349 (conspiracy to commit wire fraud and bank fraud) and 1957 (engaging in monetary transactions in property derived from specified unlawful activities). The indictment also contained two forfeiture allegations for funds seized from Mansouri-controlled bank accounts and for a Mansouri-owned vehicle (Dkt. 14).

The indictment returned by the grand jury was a detailed speaking indictment which charged a traditional wire fraud, bank fraud and money laundering theory.

On October 31, 2022, the defendant filed an omnibus motion seeking various relief to include dismissing the indictment claiming "certain elements necessary to be included in each of the counts of the indictment were not pled (Dkt. 32, ¶ 36).

On December 12, 2022, the government responded to the defendant's omnibus motion setting forth the law and corresponding facts as to why the indictment was sufficiently pled (Dkt. 35, pgs. 8-13).

On January 9, 2023, the defendant filed a reply to the government's response. The defendant's reply continued to argue the indictment should be dismissed for the reasons raised in their omnibus motion and then, for the first time, raised the argument the indictment fails to allege the scheme contemplated depriving another of or money or property since the applications did not guarantee the loan (Dkt. 41, pgs. 3-5).

On March 8, 2023, the parties appeared before the Court for oral argument. After hearing oral argument, the Court required further briefing on whether the indictment needs to allege a deprivation of property. The Court also requested the government provide information regarding the status of each of the loans obtained by the defendant.

On May 17, 2023, the Government and Defendant submitted supplemental memoranda (Dkt. 55; 56). On May 31, 2023, the Government submitted a reply (Dkt. 57). On June 29, 2023, Magistrate Judge Roemer issued a Report, Recommendation and Order denying the defendant's motion to dismiss the indictment (Dkt. 58). On August 29, 2023, the

defendant filed objections to the Report, Recommendation and Order claiming the Mansouri's Indictment is premised on the right-to-control theory recently invalidated by the United States Supreme Court (Dkt. 68). The following constitutes the Government's response.

## STANDARD OF REVIEW

The district court reviews any specific objections to a report and recommendation on a dispositive issue, such as a motion to suppress, under a de novo standard. Fed. R. Crim. P. 59(b)(3); see also 28 U.S.C. § 636(b)(1) ("A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."). "To trigger the de novo review standard, objections to a report and recommendation must be specific and clearly aimed at particular findings in the magistrate judge's proposal." *United States v. Sun*, 604 F. Supp. 3d 76, 79 (W.D.N.Y. 2022) (internal quotation marks omitted). Moreover, "it is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not." *United States v. Gladden*, 394 F. Supp. 3d 465, 480 (S.D.N.Y. 2019) (quoting *Hubbard v. Kelley*, 752 F. Supp. 2d 311, 313 (W.D.N.Y. 2009)). Finally:

> [P]ursuant to Rule 72(b) and (c) of this Court's Local Rules of Civil Procedure, written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection ... supported by legal authority, and must include a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge. Failure to comply with these provisions may result in the district judge's refusal to consider the objections.

*See United States v. Lucas*, No. 17-CR-129-EAW-JJM, 2018 WL 6313469, at *7 (W.D.N.Y. Sept. 7, 2018), *report & recommendation adopted*, No. 1:17-CR-00129 EAW, 2018 WL 5118654 (W.D.N.Y. Oct. 22, 2018), aff'd, No. 19-3937-CR, 2021 WL 3700944 (2d Cir. Aug. 20, 2021).

## ARGUMENT

I. **The Magistrate Correctly Rejected the Defendant's Argument that the Mansouri Indictment is Analogous to the "Right-To-Control" Theory Repudiated by The Supreme Court**

Defendant Mansouri argues that when he lied about having employees, overstated the number of employees, falsely represented cost of goods sold, created and submitted false and fictitious documents in support of the loan applications, so he could obtain money he was not entitled to receive, that scheme amounted to nothing more than a deprivation of economic information to the lending institutions. This argument is without merit.

The wire fraud statute prohibits using interstate wires to effect "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." Two elements of this crime are that the defendant engage in a "scheme or artifice to defraud," and that the "object of the fraud ... be '[money or] property' in the victim's hands," *Cleveland v. United States,* 531 U.S. 12, 26, 121 S.Ct. 365, 148 L.Ed.2d 221 (2000). Here the defendant's conduct satisfies both elements.

In *Ciminelli v. United States*, 598 U.S. 306, 143 U.S. 1121 (2023), and *Kelly v. United States,* 140 S.Ct. 1565, 1573 (2020) the Supreme Court held that in order to sustain a conviction for wire fraud, money or property must be the object of the fraud.

As the Supreme Court has stated, the interpretation of the phrase "money or property", relies on giving the words their ordinary meaning. *Pasquantino v. United States,* 544 U.S. 349, 355-356 (2005). In *Pasquantino*, the object of petitioner's scheme was to deprive a government of money legally due, recognizing that "fraud at common law included a scheme to deprive a victim of his entitlement to money." 544 U.S. at 356.

*Ciminelli* involved a scheme whereby two political operatives devised a scheme in order to tailor Fort Schuyler's bid process to smooth the way for LPCiminelli to receive major Buffalo Billion contracts by designating LPCiminelli as a "preferred developer," thereby giving them priority status to negotiate for specific projects. Ciminelli then jointly worked with the political operatives in order to develop a set of requests for proposal (RFPs) that effectively guaranteed LPCiminelli's selection as a preferred developer. Ciminelli, and others were indicted for, as relevant here, wire fraud in violation of 18 U. S. C. §1343 and conspiracy to commit the same under §1349. In the operative indictment and at trial, the Government relied "solely" on the Second Circuit's "right-to-control theory" of wire fraud. The Supreme Court rejected the "right-to-control theory" to support a fraud conviction based on intangible interests unconnected to property. *Ciminelli* @ 315-316.

Here, unlike *Ciminelli* the object of Mansouri's fraud was obtaining money and property that belonged to the lenders and the SBA, through false pretenses, representations and promises. Applying the ordinary meaning of "obtain" establishes that the defendant acquired and retained the money or property that belonged in the hands of lenders and the SBA. The submitted applications, that contained blatant and willful misrepresentations, along

with the falsely created documents was the mechanism the defendant used to deprive the lenders and the SBA of their money and property. So, the defendant's argument that the loan applications do not involve traditional property interests is unavailing as it misconstrues the allegations contained in the indictment. See, *United States v. Jesenik*, 3:20-CR-228, 2023 U.S. Dist. LEXIS 850080, 5-6 (D.Or. May 15, 2023) ("The object of the alleged scheme was not 'control' or 'information', but money itself.  And *Ciminelli* says nothing about federal criminal liability for such schemes, which are the archetypal subject of federal fraud prosecutions.") (Dkt. 58 pg. 13).

In addition, Mansouri's argument further misapprehends the *Ciminelli* holding because *Ciminelli* does not reach the question of whether the facts in that case could have supported a conviction under a traditional property fraud theory, rather than depriving the victim of valuable economic information for deciding to whom the contracts would be awarded. *See Ciminelli*, 143 S. Ct. at 1129; *see also United States v. Bankman-Fried*, No. 22-CR-0673 (LAK), 2023 WL 4194773, at *7 (S.D.N.Y. June 27, 2023) (rejecting defendant's reliance on *Ciminelli* in motion to dismiss wire and bank fraud charges "because each of those counts tracks the relevant statutory language and sufficiently alleges a scheme to obtain money or property"); *United States v. Runner*, No. 18-CR-0578(JS), 2023 WL 3727532, at *2 (E.D.N.Y. May 30, 2023) ("Defendant cannot use *Ciminelli* as a shield to prevent the Government from introducing the misrepresentations or omissions underlying the alleged scheme to defraud under the guise of construing those same deceptions as exclusively relevant to a victim's property interest to 'mere information' to render them unactionable.").

II. **The Magistrate Correctly Rejected the Defendant's Argument that the Banks and the SBA Never Suffered a Risk of Property Loss**

The defendant argues that since EIDL and PPP loans were SBA, guaranteed the financial institutions could not have suffered any financial harm thereby constituting a deprivation of property. (Dkt 68 pg.7-8). This argument is also meritless as the United States Supreme Court has rebutted such arguments when interpreting the fraud statutes.

The Supreme Court has found a defendant can be convicted of bank fraud even if the bank does not suffer monetary loss because the bank fraud statute "while insisting upon 'a scheme to defraud,' demands neither a showing of ultimate financial loss nor a showing of intent to cause financial loss." *Shaw v. United States*, 580 U.S. 63, 67 (2016) see also *Loughrin v. United States*, 573 U.S. 351 366 n.9 (2014) (rejecting the argument that the bank fraud statute requires the government to prove the defendant's scheme created a risk of financial loss to the bank.)

And as for the mail fraud statute, 18 U.S.C. § 1341, the Second Circuit has also addressed the meaning of the "scheme or artifice for obtaining money or property", holding a "defendant does not need to literally 'obtain' money or property to violate the statute." *Porcelli v. United States*, 404 F.3d 157, 162 (2d Cir. 2005). Porcelli was convicted of failing to collect state sales tax on gasoline sales and of filing fraudulent state sales tax returns, thereby depriving New York State of $ 5 million in tax revenue. *Id.* at 158. He sought to have his conviction overturned because he had not actually obtained any money or property from the State of New York during the course of his offense. *Id.* at 161. The Second Circuit rejected this argument, and in so doing, agreed with the Third Circuit that- "'a mail fraud

11

violation may be sufficiently found where the defendant has merely deprived another of a property right.'" *Id.* at 162 n.5 (quoting *United States v. Hedaithy*, 392 F.3d 580, 602 n.21 (3d Cir. 2004)). For purposes of establishing this element under § 1343, therefore, it is sufficient that a defendant's scheme was intended to deprive another of property rights, even if the defendant did not physically "obtain" any money or property by taking it from the victim. *See id.* at 162; *see also United States v. Greenberg*, 835 F.3d 295, 306 (2d Cir. 2016) ("[T]he Government need not prove "that the victims of the fraud were actually injured," but only "that defendants contemplated some actual harm or injury to their victims.")

The Second Circuit in *United States v. Males*, 459 F.3d 154 (2d Cir. 2006), upheld a wire fraud conviction under 18 U.S.C. § 1343 of a defendant who had represented to an FBI agent, who had posed as a potential investor, that he worked for a firm called the Bailey Group and promised the agent "exorbitant returns" on his investments if the agent (a) agreed to allow the defendant to freeze or reserve the agent's account in favor of the Bailey Group and (b) allowed Bailey Group's traders to be signatories on the account. On appeal, the defendant argued that he could not be convicted for intending to freeze the agent's account temporarily without transferring any money to himself or removing any money from the account permanently. The Second Circuit rejected this argument, thereby affirming the conviction and held that "[f]or the purposes of establishing this element under §1343… it is sufficient that a defendant's scheme was intended to deprive another of property, even if the defendant did not physically 'obtain any money or property by taking it from the victim.'" The mere fact that such a deprivation may have been intended to be only temporary was of no moment. As the court concluded "The requirement under § 1343 is that the defendant devise a scheme or

artifice for obtaining money or property is satisfied where a defendant fraudulently obtains the use of another person's money or property for a period of time, using it for his own personal profit, and depriving the owner of the ability to do so." *Males* at 158-159.

Here, Mansouri doesn't refute that he obtained money or property that belonged to the lending institutions and the SBA, through false pretenses, representations and promises. He also doesn't refute that he used the money for his own personal expenditures, to include funding his campaign account for Erie County Comptroller. Since the law neither requires a showing of ultimate financial loss nor a showing of intent to cause financial loss the Magistrate correctly rejected this argument.

## CONCLUSION

For the aforementioned reasons and those contained in the Report, Recommendation and Order, this court should adopt the Report, Recommendation and Order (Dkt. 58) in its entirety, thereby denying the defendant's motion to dismiss the indictment.

DATED:   Buffalo, New York, September 19, 2023.

TRINI E. ROSS.
United States Attorney

BY:   **s/*MICHAEL DIGIACOMO***
Assistant United States Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202
(716) 843-5700 ext. 885
Michael.Digiacomo@usdoj.gov

TO:   Herbert L. Greenman, Esq.

13